WISCONSIN EMPLOYMENT RELATIONS BOARD, Respondent, vs. RETAIL CLERKS INTERNATIONAL UNION, LOCAL No. 526, A. F. L., and another, Appellants.*

*May 4—June 2, 1953.*

---

\* Motion for rehearing denied, without costs, on September 11, 1953.

190

For the appellants there were briefs by *Padway, Goldberg & Previant* of Milwaukee, and oral argument by *David Previant*.

For the respondent there was a brief by the *Attorney General,* and *Stewart G. Honeck,* deputy attorney general, and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert*.

GEHL, J.   There is presented upon this appeal the question whether the record sustains a finding by the board that picketing was conducted by the defendant union for the unlawful purpose of (a) inducing the employer to interfere with the right of its employees to refrain from joining or assisting the union, and (b) attempting to coerce and intimidate the employees of the employer to join the union against their will.

The trial court determined that there is such support in the record, and rejected the claim of the union that the order of the board violates rights assured to the union by the Fourteenth amendment to the United States constitution, the right to freedom of speech.  Judgment confirming and for enforcement of the board's order was entered on October 1, 1952.

The parties agree that the picketing was conducted without violence.  Counsel for the union concede that if the picketing was carried on for an unlawful purpose there is no invasion of its right to freedom of speech, and say that "the only question which remains to be resolved, then, is whether the union's activities were carried on for an unlawful purpose." The issue is correctly stated, *Local Union No. 10 v. Graham,* 345 U. S. 192, 73 Sup. Ct. 585, 97 L. Ed. 946, decided March 16, 1953.  If the board's findings are supported by credible and competent evidence in the record they are conclusive, sec. 111.07 (7), Stats.

On October 22, 1951, the union through its business representative, Paul L. Whiteside, requested the employer to recognize the union as the collective-bargaining agent for its clerks. The employer refused. Upon petition of the union to the board the latter ordered, and on November 16th conducted, an election for the purpose of determining whether a majority of the employees desired the union to act as their bargaining representative. Eight of the employees voted in favor of the union and thirteen against. On November 24th the union sent letters to the employees inviting them to meet with its representative on November 27th. None appeared.

On April 4, 1952, the union commenced picketing in front of and along the side of the employer's store. The pickets carried signs stating that "Employees in This Store Are Not Members of Local 526, R. C. I. A.—A. F. of L." In addition to the picketing at the premises a single picket walked along one of the main streets of Kenosha carrying a sign reading, "The Clerks Working at Block Brothers Company Do Not Belong to Retail Clerks Local No. 526, A. F. L." The picketing was conducted during Friday and Saturday evenings, the busiest store hours of the week, and continued until the time of the hearing before the board.

There was received in evidence without objection the April 10, 1952, issue of "The Kenosha Labor," a newspaper published by the A. F. of L. and C. I. O. unions of Kenosha. There is contained in it a story regarding picketing by Local 526 at Block Brothers store. The newspaper contains a list of the names of the board of directors and officers of the publisher and recites that Whiteside is a member of the board and the treasurer thereof. The article contains among other things the following:

"There was picketing last week Friday and Saturday and there will be intermittent picketing until the employees join Local 526. The action has the approval of the International Union, Whiteside said."

The hearing before the board was held twelve days after publication of the article.

Counsel for the union stated for the record that Whiteside "has full authority to represent and bind the union." Upon adverse examination Whiteside testified that he read the newspaper article on the day of its publication, that it did not correctly state his position, and that there had been no retraction of the statement in any subsequent issue of the newspaper. On his direct examination, apparently for the purpose of explaining why the article did not correctly state his position, he testified that on the night before the hearing he met the editor and told him that the story contained several inaccuracies, that "one of them I object to very much, and that was we were trying to organize the retail clothing field," and "you are sort of giving me credit for more than I said there, because I did not say we'd picket until they became members of the union." It will be observed that this testimony refers only to what he told the editor. He was not asked at the hearing nor did he testify that he was misquoted in the statement that "there will be intermittent picketing until the employees join Local 526." He testified also that if the employees became members of the union it could be reasonably assumed that picketing would be discontinued.

Does the conduct of the union described above support the finding that there was an unlawful purpose on the part of the union? Specifically, was there a purpose to induce the employer to violate the provisions of sec. 111.06 (2) (b), Stats., which declares that it shall be an unfair labor practice—

"To coerce, intimidate, or induce any employer to interfere with any of his employees in the enjoyment of their legal rights, including those guaranteed in section 111.04, or to engage in any practice with regard to his employees which would constitute an unfair labor practice if undertaken by him on his own initiative."

The board was not bound to accept the union's claim that the picketing was carried on for but one purpose—to publicize the fact that the employees were not members of its organization. That purpose would not of itself be unlawful. But if the trier has properly found that the publication was accompanied by conduct which constitutes a violation of a valid statute, the immunity affords no protection to the violator. *Giboney v. Empire Storage Co.* 336 U. S. 490, 69 Sup. Ct. 684, 93 L. Ed. 834. The board was required to determine the real end sought by the union.

"Peaceful picketing is now recognized as an exercise of the right of free speech and therefore lawful [citing cases]. However, it cannot be made the cover for concerted action against an employer in order to achieve an unlawful or prohibited object, such as to compel an employer to coerce his employees to join a union." *Retail Clerks' Union v. Wisconsin E. R. Board,* 242 Wis. 21, 37, 6 N. W. (2d) 698.

Whiteside's demand that the employer recognize his union, followed immediately by the effort to persuade the employees to join and then by his statement published in a labor paper owned by a corporation of which he was an officer and director, that "there will be intermittent picketing until the employees join Local 526," and his testimony that picketing would be discontinued if the employees became members of the union, afford ample support for the finding that it was the purpose of the union to coerce and induce the employer, in violation of sec. 111.04, Stats., to interfere with the rights of its employees to refrain from joining the union.

It is true, as the union contends, that picketing may not be enjoined upon the sole ground that it results or may result in a reduction in the volume of the business of the employer. Competition, whether it be between management and labor, between one labor organization and another, or between commercial or industrial concerns, may quite naturally

result in the loss of business or membership of the one to the advantage of the other. We do not, however, base our conclusion upon the ground that the activity of the union in this case may have resulted in a loss in the volume of the employer's business. The circumstances to which we have referred and which occurred before and during the picketing, and not their immediate effect upon the employer's business, demonstrate a purpose to induce the employer to coerce and intimidate its employees in the enjoyment of their legal rights, sec. 111.06 (2) (a), (b), Stats., including the right to refrain from joining a labor organization, sec. 111.04.

One of the more recent cases involving the issue here presented brought to the United States supreme court is *Building Service Union v. Gazzam,* 339 U. S. 532, 70 Sup. Ct. 784, 94 L. Ed. 1045. The employer in that case operated a hotel at which he employed about 15 people. Just prior to May 1, 1946, representatives of the petitioner union called upon him about organizing his employees and asked him to sign a contract with the union which would require his employees to join it. None of his employees was a member of any union. The respondent replied that that was a matter for the employees to decide. He made no effort to interfere with the union's representatives in their effort to induce the employees to join. The union representatives, after having solicited the employees without success, called upon him again and were told once more that the matter was one for his employees.

On May 2d another meeting was had between the union's representative and the employer and he was again asked to sign the contract and declined on the ground that that would require him to coerce his employees to join a union, contrary to state law which, as the supreme court said, declared it to be the public policy of the state of Washington (p. 538), "that workers shall be free to join or not to join a union, and that they shall be free from the coercion, interference, or restraint, of *employers of labor* in the designation of their representa-

tives for collective bargaining," a policy identical with that declared by the provisions of sec. 111.06 (2) of our statutes.

A meeting of the employees was held on May 10th at which a vote was taken as to whether they wished to join the union. Nine voted against joining, one was undecided, and one voted to join. Several days later pickets began walking in front of the hotel bearing a sign reading: "Enetai Inn— Unfair to Organized Labor." The picketing was carried on by a single picket at a time and was intermittent and peaceful.

After the picketing started the employer's attorney, after consulting with his client, wrote the union's attorney that the employer was willing to negotiate further with the union but would not sign the type of contract that had been tendered him. The union then tendered a contract which provided that present employees should not be required to join as a condition of continued employment, but that any employees hired in the future would be required to join within fifteen days or be discharged.

The court said (p. 535): "The second contract was just the first contract in slow motion." Respondent refused to sign it. The picketing continued and on June 29, 1946, the employer commenced an action for an injunction.

The facts in the *Gazzam Case* are similar to those present here. In neither case was there any force, violence, or threats. The fact that in that case there was more than one meeting between the employer and the union's representatives before the picketing commenced, while here there was but one, does not distinguish the cases. Whiteside's purpose was clearly expressed at the one meeting and would not have been more clearly established by a showing that he repeated the expression at subsequent meetings.

Nor are they materially distinguishable because the election of the employees in the *Gazzam Case* appears to have been a somewhat informal one. It is the fact of the election and the declaration of the employees in each case that they did

not desire to be represented by the union which constitute the circumstances to be considered.

The court said (pp. 536, 538, 541) :

"This court has said that picketing is in part an exercise of the right of free speech guaranteed by the Federal constitution. [Citing cases.] But since picketing is more than speech and establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey, this court has not hesitated to uphold a state's restraint of acts and conduct which are an abuse of the right to picket rather than a means of peaceful and truthful publicity. . . .

"The state of Washington has by legislative enactment declared its public policy on the subject of organization of workers for bargaining purposes. . . . The meaning and effect of this declaration of policy is found in its application by the highest court of the state to the concrete facts of the instant case. Under the so-enunciated public policy of Washington, it is clear that workers shall be free to join or not to join a union, and that they shall be free from the coercion, interference, or restraint of *employers of labor* in the designation of their representatives for collective bargaining. Picketing of an employer to compel him to coerce his employees' choice of a bargaining representative is an attempt to induce a transgression of this policy, and the state here restrained the advocates of such transgression from further action with like aim. To judge the wisdom of such policy is not for us; ours is but to determine whether a restraint of picketing in reliance on the policy is an unwarranted encroachment upon rights protected from state abridgment by the Fourteenth amendment. . . .

"The public policy of Washington relied upon by the courts below to sustain this injunction is an important and widely accepted one. The broad purpose of the Act from which this policy flows was to prevent unreasonable judicial interference with legitimate objectives of workers. But abuse by workers or organizations of workers of the declared public policy of such an Act is no more to be condoned than violation of prohibitions against judicial interference with certain activities of workers. We therefore find no unwarranted restraint of

picketing here. The injunction granted was tailored to prevent a specific violation of an important state law. The decree was limited to the wrong being perpetrated, namely, 'an abusive exercise of the right to picket.' "

The court, none of the justices dissenting, affirmed the judgment of the court of the state of Washington enjoining picketing of respondent's place of business. We believe that the court's reasoning and conclusion compels affirmance in this case.

Counsel for the union in their brief suggest that they would distinguish the *Gazzam Case* upon the ground that there the picketing was conducted in support of the union's demand for a closed shop. The record in this case does not disclose what detailed terms were suggested when Whiteside requested the employer to recognize his union as the collective-bargaining agent for the employees. Such recognition could be affected in no other way than by contract or bargain. For the employer to have complied with Whiteside's request would have been a violation of sec. 111.06 (1) (e), Stats., which provides that it shall be an unlawful labor practice for an employer "to bargain collectively with the representatives of less than a majority of his employees in a collective-bargaining unit. . . ." It is conceded, as it must be, that Whiteside represented none of the employees. It is not enough that when the union made its request it had sufficient proof and indication that it could win the election which it demanded and later conducted, as the union contends. The board was not to look to what the union might have anticipated or thought to be the fact; it was the existing fact with which it was required to be concerned.

Whiteside's request was for the violation by the employer of a statute, just as was the request made by the union in the *Gazzam Case.*

They urge also that we may not consider Whiteside's request as an element supporting the board's conclusion, and

base their contention upon the fact that it made no specific finding in that regard. To that contention there are three answers: (1) The board is to find ultimate facts only, and not evidentiary facts. *Finkelstein v. Chicago & N. W. R. Co.* 217 Wis. 433, 259 N. W. 254; (2) the omission to make the specific finding, one which is necessary to support the order, is equivalent to a finding favorable to the plaintiff. *Robinson v. Marachowsky,* 184 Wis. 600, 200 N. W. 398; *Desmond v. Pierce,* 185 Wis. 479, 201 N. W. 742; and (3) there is no dispute as to the fact.

It does not appear that in the *Gazzam Case* there was a purpose on the part of the union to continue the picketing until the employees join the union. We have referred to the testimony in the instant case which permits the inference at least that that was the union's plan, a circumstance which gives additional support to the board's finding in the instant case.

The court did not in the *Gazzam Case* rest its conclusion solely upon the ground that the state of Washington, through its court and in the exercise of its power to declare its public policy on the subject of organization of workers for bargaining purposes, had found that the picketing had been conducted for an unlawful purpose and that it was bound by the latter's findings.

The union's basic claim is that the injunction is in violation of the right of freedom of speech. That is the claim consistently made in cases brought to the United States supreme court and involving the question of the right to picket for the purpose of giving publicity to a fact. The court said in the *Gazzam Case* (p. 539), that its function is "but to determine whether a restraint of picketing in reliance on the policy [of a state] is an unwarranted encroachment upon rights protected from state abridgment by the Fourteenth amendment," thus impliedly stating that, regardless of a finding by a state court, it may still determine whether there has been such en-

croachment, and reserving to itself the right to make such determination without being concerned with the findings. Manifestly, if the court had found that the injunction constituted an unwarranted encroachment upon the right of free speech it would have reversed without regard for the state court's finding.

*By the Court.*—Judgment affirmed.

BROWN, J. (*dissenting*). I cannot agree that picketing in the manner practiced here can reasonably be considered coercive rather than persuasive, or that the use of such pickets supports, even by inference, the board's conclusion that the union was engaged in an attempt to coerce or intimidate the employer or its employees. In my opinion the suppression of such picketing is an unconstitutional interference with the constitutional right of free speech.

CURRIE, J. (*dissenting*). Under the recent decisions of the United States supreme court in such cases as *Local Union No. 10 v. Graham* (1953), 345 U. S. 192, 73 Sup. Ct. 585, 97 L. Ed. 946, *Giboney v. Empire Storage & Ice Co.* (1949), 336 U. S. 490, 69 Sup. Ct. 684, 93 L. Ed. 834, and *Building Service Union v. Gazzam* (1950), 339 U. S. 532, 70 Sup. Ct. 784, 94 L. Ed. 1045, it is clear that state courts may enjoin peaceful picketing where such picketing is for an unlawful purpose as established by state statute, or court decisions; and, that the issue of such an injunction does not raise any question under the Fourteenth amendment to the United States constitution.

The question of whether the findings of the Wisconsin Employment Relations Board are supported by substantial evidence in view of the entire record under sec. 227.20, Stats., of our Uniform Administrative Procedure Act is not the only question, as I view it, before us on this appeal. Such is the question with respect to the finding of the board that the

peaceful picketing on the part of the defendants violated sec. 111.06 (2) (b) as being for the unlawful purpose of attempting to coerce and induce the employer to interfere with the right of its employees to refrain from affiliation with the defendant union.

However, with respect to the other finding of the board, that the peaceful picketing was for the unlawful purpose of "attempting to coerce and intimidate the employees of Block Brothers Company in the enjoyment of their legal rights to refrain from affiliation with the" defendant union, there is presented the question of whether such peaceful picketing in the instant case constituted a violation of sec. 111.06 (2) (a), Stats.

To persuade nonunion employees to join the union is not to persuade them to violate any law. The fact that the union had lost the election conducted by the board did not preclude it from continuing its efforts to organize the employees of Block Brothers Company. Therefore the real issue as to this aspect of the case is whether peaceful picketing of a place of employment constitutes coercion or intimidation so far as employees who work there are concerned. I do not believe that it does. It is significant that sec. 111.06 (2) (a), Stats., specifically prohibits the picketing of a domicile of an employee, but is silent about picketing the place of employment. If it is assumed that the peaceful picketing in the instant case would have the effect of diverting patronage from the store of Block Brothers Company to other stores in Kenosha having collective-bargaining agreements with the union, such effect is too indirect and remote to constitute coercion of the employees working in Block Brothers Company store.

I am satisfied that the legislature, when it used the terms "coerce or intimidate an employee in the enjoyment of his legal rights" in sec. 111.06 (2) (a), Stats., had in mind the employment of more forceful means than merely peaceful picketing of the employer's premises.

However, peaceful picketing of an employer's place of business may be coercive so far as the employer is concerned. It is well known that many members of unions will refuse to patronize any business establishment which is being picketed by a union so that, in so far as the owner of such an establishment is concerned, the picketing does carry with it a direct application of economic pressure. If there was any substantial evidence in view of the entire record to support the board's finding, that the picketing in this instance was for the unlawful purpose to "coerce, intimidate, or induce" Block Brothers Company to interfere with the free right of its employees to "refrain from affiliation with or representation by" the defendant union, the order of the board, as enforced by the judgment of the trial court, would have to be affirmed.

The majority opinion relies on two pieces of evidence as sustaining the board's finding with respect to such unlawful purpose. The first is the statement of Whiteside in the publication "The Kenosha Labor" to the effect that the picketing would continue intermittently "until the employees join Local 526;" and the demand which the union made upon the Block Brothers Company that it sign a contract with the union prior to the holding of the election by the board on November 16, 1951.

Whiteside's statement in the labor newspaper is evidence which tends to support the finding of the board with respect to the union's purpose of inducing the employees to join the union but contains no intimation that the picketing was for the purpose of forcing Block Brothers Company to do anything. If it has any probative effect on the issue of the union's purpose to coerce the employer into acting illegally, it is to negative such intent.

This leaves as the only evidence bearing on the finding of unlawful purpose to coerce the employer into interfering with the right of its employees to refrain from joining the union, or being represented by it, the demand made by the union

upon Block Brothers Company on October 22, 1951, that it enter into a contract with the union, which demand preceded the union's petition to the board for an election dated October 24, 1951.

I cannot agree with the majority opinion that the making of such demand evidenced any intent of unlawful purpose on the part of the union. In fact, such a demand is followed as a matter of course in the procedure utilized by all unions in attempting to establish collective bargaining with an employer. The first step is to secure signed applications for membership from the employee group. The second step is the making of the demand upon the company that it recognize the union and enter into a contract with it. Such a demand is usually made when the union thinks it has obtained sufficient membership applications that it may be successful in securing a majority vote of the employees designating the union as their collective-bargaining agent in an official election conducted under the auspices of the appropriate governmental agency. In Wisconsin such agency is either the Wisconsin Employment Relations Board or the National Labor Relations Board, depending on whether the employer is engaged in interstate commerce or not.

In making such demand for recognition upon the employer the union anticipates that the usual reaction of the employer will be to refuse the demand to enter into a contract or begin collective-bargaining negotiations until the appropriate governmental agency has conducted such an election among the employees, unless the union has been so successful in its organizational efforts that it is able to present convincing evidence to the employer that it does have signed application cards from a majority of the employees. In other words, the demand upon the employer to enter into a contract, or recognize the union as the collective-bargaining agent of the employees, is but a preliminary and necessary step in obtaining an election. Upon the employer's refusal to the demand,

the union then petitions the proper governmental agency to conduct such election.

In case the application for election is to the National Labor Relations Board it conducts a preliminary investigation to ascertain whether the union has sufficient signed membership applications to indicate that there is a sufficient probability that the employees will select the union to represent them if an election is conducted. The National Labor Relations Board has adopted a policy that if the union has signed membership applications from at least 30 per cent of the employees, this is sufficient evidence to warrant ordering an election; and if there is less than such percentage, there is insufficient union interest among the employees to justify ordering an election. 1 C. C. H., Labor Law Reporter (4th ed.), p. 1148, par. 1110.17. This rule is founded upon the experience of the National Labor Relations Board gained from the many thousands of elections it has conducted among employees. Such experience has demonstrated that if a union has signed membership applications from 30 per cent of the employees it is probable that a majority of the employees will vote in favor of the union as their collective-bargaining agent in the election. Such elections are secret and employees who have refused to sign union-membership applications will often vote in favor of the union as their collective-bargaining agent in such secret elections upon the theory that the union may be able to gain some advantage from the employer for the employees in the way of increased compensation, better working conditions, insurance or pension benefits, etc.

The official form of petition prescribed by the National Labor Relations Board for use by a union for certification (as the result of an election) requires, as one of the necessary allegations to be contained in such petition, "a statement that the employer declines to recognize the petitioner [the union] as the representative [of the employees as their collective-bargaining agent]." 1 C. C. H., Labor Law Reporter

(4th ed.), pp. 1188, 1189, par. 1115.53. Therefore a demand upon the employer for recognition is a virtual necessity in order for a union to secure an election under the auspices of the National Labor Relations Board.

The Wisconsin Employment Relations Board's form of petition for election does not require such an allegation but it is common knowledge that steps for collective bargaining take no different course in Wisconsin where the election follows under the proper auspices of the Wisconsin Employment Relations Board than it does where interstate commerce is involved and the National Labor Relations Board has jurisdiction. Therefore in the instant case, when the union made its demand upon the Block Brothers Company for a contract it was but pursuing the generally accepted mode of procedure employed in all union organizational efforts leading up to the securing of an election among the employees to determine whether they desire the union as their collective-bargaining agent regardless of whether such election falls under the jurisdiction of the Wisconsin Employment Relations Board or the National Labor Relations Board. The union did follow through and immediately request an election from the Wisconsin Employment Relations Board upon such demand being refused by the employer, which election was held resulting in eight employees voting in favor of the union as their collective-bargaining agent, and thirteen against.

The majority opinion states, "It is conceded, as it must be, that Whiteside represented none of the employees" (referring to October 22, 1951, when Whiteside in behalf of the union made the demand for recognition upon the employer). There is no evidence in the record bearing directly on the question of whether the union had any signed membership applications from employees of Block Brothers Company at that time. However, it is difficult to imagine an apparently able union representative, such as Whiteside, making such a request without then representing some of the employees,

because the union followed such demand by immediately petitioning the Wisconsin Employment Relations Board for an election.

A demand for recognition made by a union in order to secure an election conducted by the appropriate governmental agency is, in my opinion, no evidence whatever of any intent on the part of the union that it will apply unlawful pressure upon the employer after the election to induce the employer to interfere with the right of its employees in refraining from joining the union. This is especially true in the instant case where the election was held in November and the picketing did not commence until the following April.

As previously mentioned, without resort to such original demand upon the employer to enter into a contract with the union, there is no evidence whatever in the record to sustain the finding of the board with respect to the unlawful purpose of inducing the employer to interfere with the free right of its employees to join the union or to refrain from so doing. The peaceful picketing could either be for a lawful or an unlawful purpose, and the surrounding circumstances were not such as to cause the reasonable probabilities to favor one inference over the other. If there is any presumption at all arising under such equivocal circumstances it is against the picketing being for an unlawful purpose. Certainly the board should not be permitted to speculate in inferring such unlawful purpose where the burden of proof rested on the complainant employer to establish that the picketing was for an unlawful purpose. There may be fact situations where peaceful picketing may be conducted under circumstances where the overwhelming probabilities point to it being for an unlawful purpose without any direct evidence of unlawful intent being present, but this is not such a case.

For the foregoing reasons I believe that the judgment of the trial court should be reversed and the cause remanded to set aside the order of the board.