KINGSTON TRAP ROCK CO., A CORPORATION, AND LAM-
BERTVILLE QUARRY CO., A CORPORATION, PLAIN-
TIFFS-APPELLANTS, v. EASTERN ENGINEERING COM-
PANY, A CORPORATION, DEFENDANT-RESPONDENT.

Submitted May 26, 1944—Decided October 17, 1944.

For the appellants, *Samuel Koestler*.

For the respondent, *Vincent S. Haneman*.

The opinion of the court was delivered by

PERSKIE, J. The question for decision is whether the trial
judge misconstrued, as urged, the contract in issue.

Appellants, Kingston Trap Rock Co. and Lambertville
Quarry Co., corporations of this state, the former shall be
hereafter referred to as Kingston and the latter as Lambert-
ville, sued defendant, Eastern Engineering Company, also
a corporation of this state, which shall be hereafter referred
to as Eastern, to recover the contract price for stone they
allegedly furnished Eastern under a contract between King-
ston and Eastern dated August 6th, 1942. The complaint
consists of two counts.

The *first count* relates to the claims of Kingston. It alleges
that pursuant to its contract Kingston furnished Eastern
with 32,598.62 tons of stone, which Eastern accepted and
for which it agreed to pay at the rate of $1.50 a ton; that
of this total tonnage, 20,900.51 tons were furnished to and
accepted by Eastern on or before December 31st, 1942, and
Eastern paid for same; that the remaining 11,698.11 tons
were furnished between January 1st, 1943, and March 9th,
1943, and as so furnished were accepted but not paid for by

Eastern; and thus that there was due and owing to Kingston the sum of $17,547.16 plus interest.

The *second count* relates to the claim of Lambertville. It alleges that pursuant to the stated contract (August 6th, 1942) Lambertville furnished Eastern, at its request, 14,003.22 tons of stone at the agreed rate of $1.38 a ton, the difference of twelve cents on each ton being the allowed difference in the freight rates as provided by the contract; that of this total, 9,275.2 tons were furnished to and accepted by Eastern on or before December 31st, 1942, and Eastern paid for same; that the remaining 4,728.02 tons were furnished between January 1st, 1943, and March 9th, 1943, and were accepted but, as with Kingston's claim, were not paid for by Eastern; and that thus there was due and owing to Lambertville $6,524.66 plus interest. Kingston joined in this count as plaintiff, in the alternative, in the event it would be determined that the claim of Lambertville resides in Kingston under the contract.

Eastern denied liability. Additionally, it sought to recover from Kingston, by way of counter-claim, the damages it allegedly suffered because of Kingston's breach of the contract. More specifically stated, the alleged breach was that Kingston did not furnish between 500 to 700 tons of stone a day as it had contracted to do notwithstanding that it had been advised that such daily supply was vitally necessary in order for Eastern to complete its contract with the United States of America for the construction of two parallel rubble jetties at the Delaware Bay entrance to the Cape May County Canal, and notwithstanding that frequent demands were made upon Kingston to comply with its contract with Eastern, and notwithstanding that Kingston was advised that its failure to do so was causing it (Eastern) delay in completing the construction of the jetties with resultant money loss which Kingston would be called upon to satisfy. The alleged money loss of $32,128 is made up as follows: (1) $22,718 expended for additional equipment and labor, (2) $7,410 increased costs for hauling and trucking, and (3) $2,000 excess costs for general office overhead.

Kingston denied liability on the counter-claim. Of its

additional six separate defenses but three (first, fifth and sixth) are admittedly embraced in the like numbered grounds of appeal here argued.

The first separate defense concedes its contractual obligation to furnish approximately 500 to 700 tons of stone a day during the months of August, September, October and November, 1942, but asserts that Eastern refused to order or accept such supply and hence waived any right or claim for damages for the non-delivery in the specified quantities; the fifth is that it was not obliged under the provisions of the contract ("Contingencies") to furnish stone in any specified quantities after December 1st, 1942; and the sixth is that under the further contingent provisions of the contract it was unable to obtain cars from the railroads to furnish the specified daily quantities of stone.

At the end of the proofs offered by Kingston and Lambertville in support of their alleged claims, the trial judge granted Eastern's motion for a nonsuit as to Lambertville. Judgment of nonsuit was entered accordingly. Pursuant to the directions of the trial judge on the motion to nonsuit, the trial proceeded on the basis that the claims embraced in both counts constituted a single claim of Kingston against Eastern. The case was so tried. Notwithstanding its pleaded denial of liability, Eastern in the course of the trial admitted, but without prejudice to its counter-claim, that it owed Kingston the sum of $25,293.11 under both counts. Accordingly, the jury, as directed, returned a verdict in the admitted amount in favor of Kingston and against Eastern. From the judgment entered upon that verdict, no appeal is taken. On the conflicting proofs as to which of the parties was at fault on Eastern's counter-claim, the jury returned a verdict of $20,000 in favor of Eastern and against Kingston. Judgment was entered accordingly. Hence Kingston in case No. 10 and Lambertville in case No. 14, appeal.

*As to Kingston's appeal.* The contract in issue has for its source a public invitation, issued in July of 1942, by the United States of America (Engineering Office of the War Department) for the furnishing of the necessary equipment, *materials,* &c., and for the construction of the stated

jetties. (Italics supplied.) To the end of submitting a bid on the day set (July 29th, 1942) Eastern communicated with Kingston. It was advised that Kingston was thoroughly familiar with the specifications, the three classes of stone and the quantities thereof required, and that it had given quotations thereon. It quoted Eastern the price of $1.50 a ton plus freight. Eastern was the successful bidder. It further negotiated with the government, as it was obliged to do under the advertised form of "Negotiated Contract," with results satisfactory to each. Eastern, however, did not sign the contract with the government until it further assured itself of Kingston's ability to supply the stone in the time and in the quantities specified. Accordingly, the vice-president of Eastern called upon the president of Kingston and informed him that Eastern did not want to sign the government contract unless it could be assured of deliveries of stone of 500 to 600 tons a day. The president of Kingston called in its foreman, all three discussed the situation in detail. Kingston was advised of the beginning date (August 20th, 1942) and completion date (December 28th, 1942) and that Eastern would require a few weeks to make preparatory arrangements such as building roads, &c. The result reached was that Kingston could with the purchase of an additional crane meet the requirements. Thus it was that the conceded confirmation, under date of August 4th, 1942, of the oral quotations, was accepted for Eastern on August 6th, 1942. The contract between the government and Eastern, although dated July 29th, 1942, pursuant to the prescribed government practice, was in fact signed by the parties some two or three weeks thereafter.

The instrument in issue, dated August 6th, 1942, is on the business letterhead of Kingston, and so far as is here pertinent, reads as follows:

"Eastern Engineering Co.,
4 North North Carolina Ave.
Atlantic City, N. J.
Gentlemen:

We are pleased to quote you the following prices on *all* the Jetty Stone required to complete the two jetties at Cape

May, New Jersey under U. S. Gov't. Dept of Engineers. All the jetty stone is to be in accordance with the specifications (approximate tonnage 48,000 tons). [Italics supplied.]
25%-35%  25# to 450# @ $1.50 a ton, f. o. b. plant
35%-45%  450# to 4½ ton @ $1.50 per ton f. o. b. plant
25%-35%  4½ ton to 9 ton @ $1.50 per ton f. o. b. plant

These prices will hold good for Lambertville, Pennington and Kingston.

The approximate daily delivery will be between 500 and 700 tons.

The freight rates are as follows:
Lambertville and Kingston to Cape May—   $1.59, per ton.
Pennington to Cape May                     1.47 per ton.

Unless the freight is reduced we will absorb the difference in freight between Pennington and Lambertville *on stone shipped* from Lambertville." (The italicized words and the initialing thereof "per H. I. E." are in writing.)

\*       \*       \*       \*       \*       \*       \*

"CONTINGENCIES—Quotations subject to change without notice and are made for shipments only during the current open season, April 1st to December 1st. Winter shipments are subject to extra charge and prior sale of stock on hand. Orders accepted only for shipment during the current, open season, unless specifically arranged for in writing.

"All contracts and agreements are contingent upon strikes, accidents, delay of carriers, weather conditions, car and other contingencies unavoidable and beyond our control."

\*   '   \*       \*       \*       \*       \*       \*

"Kingston Trap Rock Co.
by Linus R. Gilbert Pres."

"Accepted by
Eastern Engineering Co.
H. I. Eaton, Vice-Pres.
6th day of August 1942."

The portion prior to paragraph headed "Contingencies" is in typewritten form and the portion thereafter is in printed form. The signature of the respective officers of the respective parties are in writing.

The actual number of tons required was 57,000. Kingston (under both counts) supplied but 46,601.84 tons.

1. The trial judge correctly construed the contract to mean that Kingston was obligated daily to furnish 500 to 700 tons of stone until the stone requirements to complete the undertaking had been fulfilled notwithstanding the fact that it took beyond December 1st, 1942, to do so. For whether the first provision under the heading of "Contingencies" is or is not a part of the contract in the legal sense urged, namely, that Kingston was not obliged to furnish stone in any quantities after December 1st, 1942, is beside the point. This provision was completely ignored by the conduct of the contracting parties. The allegations of the complaint as to the quantities and dates on which the stone was furnished and accepted demonstrate that the parties interpreted their agreement without regard to the asserted contingency provisions, as if they had not appeared in the contract. In some months after December 1st, 1942, Kingston furnished and Eastern accepted tonnage of stone equal to the highest monthly average prior to December 1st, 1942. Stone shipped by Kingston after December 1st, 1942, was billed at the same rate as that billed for stone furnished prior thereto. There was no "specifically arranged" writing relating to the furnishing of stone after December 1st, 1942, and no extra charge for such stone was either suggested or considered by either of the parties. The contingency provisions were in fact not asserted until the counter-claim was filed by Eastern.

Thus comes into play one of the practical, strongly influential, and sound standards of construction to determine the intended meaning of a contract alleged to be doubtful, namely, to ascertain the meaning which parties by their conduct gave to their contract, and then construe it accordingly. *Cf. Corn Exchange, &c., Philadelphia* v. *Taubel,* 113 *N. J. L.* 605, 611; 175 *Atl. Rep.* 55; *Lippincott* v. *Content,* 123 *N. J. L.* 277; 8 *Atl. Rep.* (2d) 362. There is "no surer way" to ascertain the intention of the parties to a contract. *Thomsen* v. *Riedel,* 114 *N. J. L.* 379, 383; 176 *Atl. Rep.* 701. The trial judge did just that. He adopted the construction which the parties gave to their contract as evidenced by their

conduct. He was right in so doing. *Cf. Ganary* v. *Linker Realty Corp.*, 131 *N. J. L.* 317, 320; 36 *Atl. Rep.* (2*d*) 405.

2. We find no error in the exclusion of the two questions posed to Mr. Linus R. Gilbert. The first reads: "Of the cars you received did you allot a due proportion to this job?" This clearly calls for a conclusion. The second reads: "Were all of the railroad cars that were furnished to you by the railroads in the quarries used by you for the shipment of stone to this contract, and other contractors?" This also is improper; it does not support the proffer of inability to obtain cars within the language of the second paragraph under "Contingencies."

3. Nor do we find any error injuriously affecting the substantial rights (*R. S.* 2:27–363) of Kingston in having permitted Walter Murphy to testify, in substance, that pursuant to arrangement he would daily advise Kingston of the classes of stone required, &c., and that "there was never one day it was exact as I ordered, but one day they did exceed it."

Eastern's judgment (case No. 10) is affirmed, with costs.

*As to Lambertville's claim.* The judgment of nonsuit is proper.

Lambertville is not a party to the contract between Kingston and Eastern. Nor is that contract one which was made for the benefit of Lambertville. *R. S.* 2:26–3.6. The majority stock of Kingston, Lambertville and Pennington Trap Rock Company is owned by Mr. Gilbert. The reference in the contract to Lambertville as the reference to Pennington provides for an adjustment of the freight rates for stone furnished from Lambertville and from Pennington, and it further serves to satisfy the government's requirement obliging the bidder to state the "sources of the stone." While it is true that some of the stone was furnished by Lambertville directly to Eastern and was paid for directly by Eastern to Lambertville, it is equally true that the stone so furnished was not on Eastern's orders but on orders from Kingston.

It is quite obvious that Lambertville joined in the suit with Kingston out of an overabundance of caution.

The judgment of nonsuit (case No. 14) is affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, DILL, JJ. 16.

*For reversal*—None.