Wisconsin Employment Relations Board, Respondent, vs. Journeymen Barbers, Hairdressers, Cosmetologists & Proprietors International Union of America and others, Appellants.*

*January 11—February 7, 1956.*

* Motion for rehearing denied, with $25 costs, on April 3, 1956.

For the appellants there was a brief by *Warne, Duffy & Dewane of Green Bay,* and oral argument by *Lloyd O. Warne.*

For the respondent there was a brief by the *Attorney General* and *Stewart G. Honeck,* deputy attorney general, and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert.*

For the complainant Leland J. Le Mieux there was a brief by *Welsh, Trowbridge, Wilmer & Bills,* and oral argument by *Lloyd J. Planert,* all of Green Bay.

CURRIE, J.  For many years the craft unions organized by the American Federation of Labor in the skilled trades have followed the policy that, where an employer works with the tools of his trade, he, as well as his employees, must be members of the union in order that the employer be considered as operating a "union shop." Pursuant to this policy the barbers union has provided by sec. 5, art. VII of its constitution, as follows: "No [union] shop card shall be displayed in a barber or beauty shop unless all persons working in the shop with the tools of the trade are members of the union in good standing." Both the conditions printed on the back of the union-shop card, and the separate written agreements exacted from shop proprietors governing the display of the card, make observance of such provision of the union's constitution necessary in order to entitle the shop proprietor to continue to display the card in his shop.

This court in *Wisconsin E. R. Board v. Journeymen Barbers* (1949), 256 Wis. 77, 39 N. W. (2d) 725, held it to be a violation of sec. 111.06 (1) (b), Stats., as such section was then worded, for an employer to belong and pay dues to the same union of which his employees were members. This was because such section made it an unfair labor practice for an employer to contribute financial support to any labor organization.  The first general session of the legislature following such decision, that held in 1951, amended sec. 111.06 (1) (b) by adding thereto the following proviso: "Provided, however, that it shall not be an unfair labor practice for an employer to become a member of the same labor organization of which his employees are members, when he and they work at the same trade." At the same time the 1951 legislature created sec. 111.06 (2) (m) which makes it an unfair labor practice for an employee individually, or in concert with others, "To coerce or intimidate an employer working at the same trade of his employees to induce him to become a member of the labor

organization of which they are members, permissible pursuant to sec. 111.06 (1) (b)."

Inasmuch as Le Mieux had ceased to be a member of Guild No. 27 at the time the union-shop card was removed from his shop in February, 1954, there is no question but that the union had the right under the printed conditions appearing on the back of the card, and those of the separate contract entered into with the father, to so remove the card. The issue before us on this appeal is whether either the contract governing the display of the card, or the removal of the card when such contract was breached by Le Mieux, constituted coercion within the meaning of sec. 111.06 (2) (m) so as to make the defendants guilty of an unfair labor practice.

We think the first approach to the problem is to analyze the nature of the union-shop card. It would appear obvious that it stands in the same category as a union label attached to, or imprinted upon, goods made by union labor. Both are in the nature of a recommendation by the union, which owns the card or label, of the services or goods to which such card or label appertains.

The recommendation by the barbers union of a particular barbershop to those of the general public who may be interested in patronizing such shop, by furnishing the proprietor with a union-shop card to be displayed on the wall of his shop, is an exercise of the right of free speech guaranteed by the First amendment of the United States constitution as incorporated by the Fourteenth amendment. In the absence of any untruthful statement publicized by such card, we doubt if any legislature or court would have the constitutional right to interfere with the exercise of such right. On principle we cannot distinguish the act of withdrawing such recommendation, by removing the card pursuant to a contract entered into between the shop proprietor and the union, from the right to make use of the card in the first place for the purpose of recommending the shop to the public. The

right to cease to speak would seem to be as much a right of free speech as the right to speak.

The attorney general contends that while an act, which if performed by one person, might be lawful, if it be done by several people in concert to attain an illegal objective, would be unlawful and subject to regulation. In support of such contention there are cited the cases of *International Union v. Wisconsin E. R. Board* (1947), 250 Wis. 550, 563, 27 N. W. (2d) 875, 28 N. W. (2d) 254, and *Judevine v. Benzies-Montanye Fuel & Whse. Co.* (1936), 222 Wis. 512, 525, 269 N. W. 295. While we have no quarrel with the correctness of the principle as stated by the attorney general, we fail to see how it is applicable to the instant case. Since the 1951 amendment to sec. 111.06 (1) (b), Stats., it has been a legitimate objective for the barbers union to seek to have barbershop operators working at the barber trade belong to the union, or a local affiliated with it, as well as their employees.

For this same reason we consider the case of *Journeymen Barbers v. Industrial Comm.* (1953), 128 Colo. 121, 260 Pac. (2d) 941, 42 A. L. R. (2d) 700, to be readily distinguishable from the case at bar. The controlling Colorado statute in such case was similar to the provisions of sec. 111.06 (1) (b), Wis. Stats., as it stood prior to the adoption of the 1951 amendment. The Colorado court held that the contract between the barbershop proprietor and the barbers union, which permitted the withdrawal of the union-shop card when the proprietor ceased to be a member of the union, contravened the statute and was void. Because of this the union was denied the right to remove the card.

However, the Ohio court has held that the barbers union has the right to remove its union-shop card from a barbershop, where the contract with the shop proprietor for the display of the card authorizes it so to do, irrespective of whether the attempted removal may have been undertaken by the union for an unlawful objective. *Foutts v. Journeymen*

*Barbers* (1951), 155 Ohio St. 573, 578, 99 N. E. (2d) 782, 785. We quote from the opinion in that case as follows:

"Where picketing, a strike, or a boycott against an employer by a union is involved, it may be appropriate to determine whether the object sought to be achieved by such union activity is legal and proper. *Crosby v. Rath,* 136 Ohio St. 352, 25 N. E. (2d) 934, certiorari denied, 312 U. S. 690, 85 L. Ed. 1126, 61 S. Ct. 618; Restatement of the Law of Torts, section 775. However, where a union merely discontinues its recommendation or approval of an employer and is under no contractual obligation to continue such recommendation or approval, it may discontinue such recommendation or approval for any reason." [Citing among other authorities 31 Am. Jur., Labor, p. 869, sec. 84.]

The above quotation from the *Foutts Case* is quoted verbatim with approval by the Alabama court in its very recent decision in *Head v. Journeymen Barbers* (1955), 262 Ala. 84, 88, 77 So. (2d) 363, 367.

It is the further position of the attorney general that the removal of the shop card equates picketing because both result in economic pressure being exerted upon the employer by reason of prospective customers being induced to withhold their patronage. Proceeding from this premise, it is urged that, if picketing which is thus coercive may be enjoined under certain circumstances as an unfair labor practice, it follows that the barbers union, its locals, and officers, may likewise be enjoined from removing the union-shop card or be compelled to restore it to the shop proprietor after its removal. However, as this court pointed out in *Wisconsin E. R. Board v. Retail Clerks Int. Union* (1953), 264 Wis. 189, 194, 58 N. W. (2d) 655, the fact that picketing may cause loss of patronage to the employer does not convert conduct otherwise lawful into an unlawful activity.

The reason that peaceful picketing may be enjoined when conducted in aid of an unlawful objective is that it embodies more than the exercise of free speech. As Mr. Justice MINTON aptly observed in *Building Service Union v. Gazzam* (1950),

339 U. S. 532, 537, 70 Sup. Ct. 784, 94 L. Ed. 1045, "picketing is more than speech and establishes a *locus in quo* that has far more potential for inducing action or non-action than the message the pickets convey." This is not true of the ceasing by the barbers union to recommend a certain barbershop occasioned by the removal of its union-shop card from the walls of the building in which the shop is being operated.

The words "coerce or intimidate" appearing in sec. 111.06 (2) (m), Stats., must be construed in the light of sec. 111.15, which provides, nothing "in this subchapter [shall] be so construed as to invade unlawfully the right to freedom of speech." As so construed, the removal of the union-shop card, in view of the principles hereinbefore stated in this opinion, does not constitute coercion within the meaning of sec. 111.06 (2) (m).

The Ohio court in its decision in *Foutts v. Journeymen Barbers, supra,* points out a further reason of public policy why the barbers union should not be ordered to restore a union-shop card which it had removed by reason of the shop proprietor ceasing to be a member of the union. We quote further from such opinion as follows (155 Ohio St. 578, 579):

"The display of the union-shop card in the instant case is a representation by the plaintiff to his employees and to the public that the plaintiff is recommended by and has the approval of the defendant union. If the plaintiff is not so recommended and does not have that approval, then that representation is false. Such a false representation will necessarily tend to deceive the public and the employees of the plaintiff. In the instant case, if a court of equity enjoins the defendant union from removing its shop card when the defendant union no longer either recommends or approves the plaintiff, then that court will thereby enable the plaintiff to deceive the public."

We cannot believe that the legislature intended sec. 111.06 (2) (m), Stats., to be so construed as to enforce a course of

conduct which must necessarily result in a deception of the public in the manner above stated.

The judgment appealed from, in addition to granting enforcement of the W. E. R. B. order with respect to the restoration of the union-shop card to Le Mieux, also enforces that portion of such order which restrains the defendants from enforcing the section of the union constitution that provides for punishment being meted out to any union member who would continue to work for Le Mieux after the removal of the union-shop card. However, W. E. R. B. in its findings of fact, expressly found that at no time had any of the defendants "suggested, intimated, or ordered Albertz [the only employee of Le Mieux who was a member of the union] to leave the employment of the complainant Le Mieux." We, therefore, do not consider that the findings support such portion of the order.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter a judgment setting aside the W. E. R. B. order dated October 29, 1954.