THE JOURNEYMEN BARBERS, HAIRDRESSERS AND COS-
METOLOGISTS' INTERNATIONAL UNION OF AMERICA,
LOCAL 687, NOW KNOWN AS JOURNEYMEN BARBERS,
HAIRDRESSERS, COSMETOLOGISTS AND PROPRIE-
TORS' INTERNATIONAL UNION OF AMERICA, LOCAL
UNION 687, PLAINTIFF-RESPONDENT, v. ROY POLLINO,
VINCENT CANNAMELA, CHARLES GUARINO AND JOHN
TOTH, DEFENDANTS-APPELLANTS.

Argued September 17 and 24, 1956—Decided October 29, 1956.

Mr. *Meyer E. Ruback* argued the cause for the appellants (*Mr. Samuel V. Convery,* attorney; *Mr. John J. Clancy,* of counsel; *Mr. Sam Weiss,* on the brief).

Mr. *Abraham L. Friedman* argued the cause for the respondent (*Messrs. Rothbard, Harris & Oxfeld,* attorneys; *Mr. Samuel L. Rothbard,* of counsel).

The opinion of the court was delivered by

JACOBS, J.  The Middlesex County District Court rejected the plaintiff union's claim in replevin for the return of its union shop cards possessed by the defendants who operate barbershops in Perth Amboy; the Appellate Division in an opinion reported at 39 *N. J. Super.* 250 (*App. Div.* 1956) reversed the district court with direction that judgment be entered for the plaintiff; we granted certification on the defendants' application under *R. R.* 1:10–2.

The plaintiff is Local Union 687 of the Journeymen Barbers, Hairdressers, Cosmetologists and Proprietors' International Union of America.  It has jurisdiction over Perth Amboy and vicinity and has entered into union contracts governing many barbershops in that area; some of these barbershops are operated by proprietors who have no employees at all; others are operated by proprietors who work as barbers alongside one or more barbers employed by them.  Barbershops which are operating under union contracts may obtain shop cards from the union for display at the premises; these cards bear the seal of the International Union, a facsimile of its president's signature, the words "Union Shop" in large letters, and the statement that the card is the property of the union and is subject to the conditions set forth on the back thereof; the brief filed by the defendants in the instant matter acknowledges that the shop card is "designed for display in a barbershop as a symbol of union recognition."  When a shop card is delivered, its recipient signs a stipulation which provides that he will comply with the conditions on the back of the card, that it shall remain the property of the union, and that it is loaned only during compliance with the conditions; and he agrees, on demand, to allow peaceful removal of the card by a duly appointed representative of the union.  The conditions on the back of the card embody agreements by the recipient that he will (a) abide by the laws of the International Union, (b) abide by the laws of the local union, (c) peaceably surrender the card for the violation of any laws of the International or local, and (d) peaceably surrender the card "for

any cause when called upon to do so." The laws of the International provide that any shop "recognized as a union shop" by the laws and principles of the union shall be entitled to display the shop card; that the shop card shall not be displayed in a barbershop "unless all persons working in the shop with the tools of the trade are members of the union in good standing"; and that an employer who works at the trade and "desires to operate a union shop must become an employer member of the local union" (or a proprietor's guild provided for by the International's constitution).

The four defendants own shops in Perth Amboy and work in them as barbers. One of them employs three journeymen barbers and each of the others employs a single journeyman barber. The defendants are not members of the union or a proprietor's guild but are members of the Perth Amboy Chapter of the Associated Master Barbers of New Jersey which acted for them in bargaining negotiations with the union. The last written agreement between the union and the Perth Amboy barbers was dated August 1, 1953 and was to continue for one year until July 31, 1954, with provision for automatic yearly renewal without notice, and with further provision "that either party may open this agreement for the purpose of discussion or revision upon written notice being served upon either party by the other not less than thirty days prior to expiration of this agreement." Under date of May 3, 1954 the union addressed a letter to the Associated Master Barbers advising that the agreement would "soon expire" and that it would like to meet "to talk about a new contract." In response the union received a letter from the Perth Amboy Chapter advising that it would meet with the union's committee at its convenience. Thereafter negotiations were conducted between representatives of the union and the Perth Amboy barbers but no new agreement was ever reached or executed. When negotiations were broken off on July 29, 1954 by the withdrawal of the union's representative from the bargaining session there were two union demands which had not been met, namely, (1) that

employer barbers, such as the defendants, who worked with the tools of their trade should join the union in accordance with the International's constitution, and (2) that the barbershops should close at 6 P. M. Thereafter a letter was sent to the union indicating acceptance of the 6 P. M. closing hour, but the demand that the employer barbers join the union or a proprietor's guild has been and is still being resisted.

Notwithstanding the failure of the negotiations and the absence of any new union agreement, each of the defendants continued to display the union shop card in his place of business. Demand for their return was refused and on February 11, 1955 the union filed its complaint demanding possession of the shop cards. Thereafter trial was duly held and the witnesses testifying for both parties agreed that the 1953 contract had expired and that there was then outstanding no bargaining contract between the union and the defendants. The defendants' position in the district court was that the union had refused to enter into a new contract solely because of their refusal to join the union and that in the light of that circumstance its replevin claim for return of the shop cards should be rejected. The district court entered judgment for the defendants and cited *Simon v. Journeymen Barbers, &c., Union, Local No. 315,* 11 *N. J.* 448 (1953), where this court, in an opinion by Justice Wachenfeld, enjoined picketing which was designed to compel employer barbers to become members of the union without, however, any voting rights on matters pertaining to wages and hours and without eligibility to hold office in the local or International union. The authority to retain and display the union shop cards was not passed upon in the *Simon* case. After the opinion was filed the International's constitution was amended to provide, as it now does, that any barber who works at the trade and is otherwise qualified is eligible to membership and "all members are entitled to equal rights of membership including the right to vote or hold office."

On the union's appeal from the adverse judgment in the district court the defendants again took the position that

although the union contract had terminated and had not been renewed they were nevertheless entitled to retain and display the union shop cards because of the alleged illegality of the union's demand. Thus their brief expressly set forth that the signed contract dated August 1, 1953 had expired July 31, 1954, and that although the parties had conducted negotiations for a new agreement "none was signed and none has been in effect since the expiration of the signed contract." The Appellate Division properly rendered its opinion on the basis of the case thus presented by the record and the briefs and argument of counsel; it took the position that a shop which is no longer recognized by the plaintiff as a union shop should not, in any event, be permitted to display a sign declaring that it is recognized by the plaintiff as a union shop; and it found that under the explicit arrangements between the parties when the cards were originally delivered the cards remained the property of the union and could now properly be reclaimed in an action for replevin. See 39 *N. J. Super.*, at *page* 261. See also *Wisconsin Employment Relations Bd. v. Journeymen Barbers, etc.*, 272 *Wis.* 84, 74 *N. W.* 2d 815 (1956); *Foutts v. Journeymen Barbers, etc.*, 155 *Ohio St.* 573, 99 *N. E.* 2d 782 (1951); *Head v. Local Union No. 83, Journeymen Barbers*, 262 *Ala.* 84, 77 *So.* 2d 363 (1955); *Rainwaler v. Trimble*, 207 *Ga.* 306, 61 *S. E.* 2d 420 (1950).

In this court the defendants seek to alter and reverse the course they took in the lower courts; they now urge that the contract dated August 1, 1953 did not expire on July 31, 1954, but is still in effect. *Cf. Kerkemeyer v. Midkiff* (*Mo.*), —— *S. W.* 2d —— (1956). Their present construction entails the rather far-reaching notion that the parties contemplated a collective bargaining contract which would continue forever unless properly changed by mutual consent. No such contemplation is apparent from the language in the contract and the practical construction which both parties placed on it was obviously to the contrary. Although the contract provided for automatic yearly renewal it expressly stipulated that either party could open

it for revision upon proper notice. The letter of May 3, 1954 was rather informal but was treated by both parties as sufficient notice for the opening of the agreement and there is no reason why we should do otherwise. In their negotiations thereafter both parties acted consistently on their concordant views that the agreement would expire on July 31, 1954 and that if no new agreement was reached by that date there would be no collective bargaining contract then in effect. This practical interpretation is, of course, entitled to great weight. See *Kingston Trap Rock Co. v. Eastern Engineering Co.*, 132 *N. J. L.* 254, 259 (*E. & A.* 1944); *William Berland Realty Co. v. Hahne & Co.*, 26 *N. J. Super.* 477, 496 (*Ch. Div.* 1953), *modified*, 29 *N. J. Super.* 316 (*App. Div.* 1954). In the *Berland Realty* case Judge Speakman aptly remarked that where the meaning of contractual language is doubtful the best guide is furnished by the parties' construction as manifested by their conduct. Finally, the case was tried and determined in the lower courts on the basis of the assertion by both parties that the contract had expired and had not been renewed; as Justice Burling pointed out in *Brown v. Brown*, 2 *N. J.* 252, 255 (1949) this court does not ordinarily "permit a litigant to plead and try his case upon one theory and then, if unsuccessful, advance another theory upon appeal." See *Lippman v. Ostrum*, 22 *N. J.* 14, 26 (1956); *Beckmann v. Township of Teaneck*, 6 *N. J.* 530, 537 (1951). In the instant matter we are entirely satisfied that the determination in this court must justly be founded on the premise that the contract had expired and that no new contract was entered into primarily because the defendants rejected the demand that they become members of the union.

The defendants contend that the objective of the plaintiff to have them become members of the union "is unlawful because they would become bound by provisions of the International Union Constitution which would incapacitate them from acting as free agents in the negotiation of collective bargaining agreements." In particular they complain about article II, section 4 of the International's constitution which

prohibits any member of the International from bringing any civil action against the union; article XVII, section 7 which provides that any member who shall operate against the interests of the union shall have his membership annulled; article XVII, section 8 which forbids any active member of the International from joining any dual organization which is composed wholly or partly of employers; and article XVIII, section 1 which provides that any member found guilty of preventing the passage of legislation endorsed by the International shall be fined. These provisions would appear to be wholly unenforceable as against an employer member who, in the rightful advancement of his own proper interests as an employer, joins an association of employers, brings a proceeding against the union, advocates legislation opposed by the union, or takes other action of similar design. In the instant matter there is no suggestion that the union is seeking to enforce any of these provisions against any employer members; on the contrary, counsel for the union indicated at oral argument that the defendants might properly retain their membership in the Associated Master Barbers of New Jersey (*cf. R. S.* 34:12–5) and otherwise protect their interests as employers but urged that the provisions were separable and were in nowise controlling on the single issue presented as to the union's legal right to reclaim its shop cards in its district court replevin action. *Cf. Mannion v. Greenbrook Hotel, Inc.,* 138 *N. J. Eq.* 518, 520 (*E. & A.* 1946) ; *Cameron v. International Alliance, &c., U. S. & Canada,* 119 *N. J. Eq.* 577, 589 (*E. & A.* 1936), *certiorari* denied, 298 *U. S.* 659, 56 *S. Ct.* 681, 80 *L. Ed.* 1385 (1936).

Apart from offensive provisions such as those complained about, support may be found in the cases for the union's view that (absent restrictive legislation) there is no general public policy against a requirement that employers, who actually work with the tools of their trade alongside their employees, must become members of the union and support it at least to the extent that their interests coincide. See *Wisconsin Employment Relations Bd. v. Journeymen Barbers, etc., supra; Head v. Local Union No. 83, Journeymen*

*Barbers, supra; Master Plumbers Ass'n of Albany v. Weir,* 258 *App. Div.* 76, 77, 15 *N. Y. S.* 2d 889, 890 (3d *Dep't.* 1939). *Cf. Riviello v. Journeymen Barbers, etc.,* 88 *Cal. App.* 2d 499, 199 *P.* 2d 400, 403 (1948); *Coons v. Journeymen Barbers, etc.,* 222 *Minn.* 100, 23 *N. W.* 2d 345 (1946). But *cf. Kerkemeyer v. Midkiff, supra.* In the *Weir* case [285 *App. Div.* 76, 15 *N. Y. S.* 2d 890] the court upheld the legality of a union provision to the effect that working-employers shall pay dues and abide by the union's rules and regulations; Justice Bliss described the proprietor who actually labors alongside the union members as being "at times an employer and at others a workman." Similarly in the *Riviello* case, the court, while striking down a union requirement that an employer who works with the tools of his trade become a limited or "sterile" member of the union, saw nothing wrong in a requirement that he become a member of the union with full and equal rights; in the course of his opinion Justice Peters said [88 *Cal. App.* 2d 499, 199 *P.* 2d 403]:

"Here the agreement does not attempt to compel the employer to join an employer organization, but it attempts to compel such employer, who works at the trade in competition with union members, to join an employee organization. That is clearly a proper labor objective, and is for the 'mutual aid or protection' of employees as provided in § 923 of the Labor Code, the section declaring the state policy on such questions. The effort to organize all barbers who work in the trade is clearly a legitimate interest of the barbers' union. It is evident that an employer-worker is in competition with all other barbers who are not employers. Without being subject to union sanctions for violating the wages, hours and conditions of employment imposed on union members, the employer-worker could gain a great advantage to the detriment of the union members."

Compare *Cafeteria Employees Union v. Angelos, Local 302,* 320 *U. S.* 293, 64 *S. Ct.* 126, 88 *L. Ed.* 58 (1943) with *International Brotherhood of Teamsters, etc., v. Hanke,* 339 *U. S.* 470, 70 *S. Ct.* 773, 94 *L. Ed.* 995 (1950).

Since the defendants are not engaged in interstate commerce we need not consider the provisions of the Taft-Hartley Act (29 *U. S. C. A.* 158(*b*)(4)(*A*)), and since the New

Jersey Legislature has not enacted any pertinent statutory provisions we need not be concerned with cases such as *Wisconsin Employment Relations Bd. v. Journeymen Barbers, etc., 256 Wis. 77, 39 N. W. 2d 725* (1949), and *Di Leo v. Daneault, 329 Mass. 590, 109 N. E. 2d 824* (1953), where the courts dealt with state statutes prohibiting employers from contributing financial or other support to labor unions. It may be noted that there have been recent statutory amendments in both Wisconsin and Massachusetts; a proviso adopted by the Wisconsin Legislature in 1951 states "that it shall not be an unfair labor practice for an employer to become a member of the same labor organization of which his employes are members, when he and they work at the same trade" (*Wis. Laws* 1951, c. 661); and a 1956 amendment by the Massachusetts Legislature provides that "An employer shall not be prohibited from paying regular initiation fees, dues and assessments to any labor organization in which he is a member or is eligible for membership." (*Mass. Stat.* 1956, c. 286). Whether a union should be permitted to require those who work with the tools of their trade alongside their employees to become union members is an important matter of public policy on which the present New Jersey statutes are silent. *Cf. N. J. S. 2A*:15–51 *et seq.; R. S.* 34:12–5; *R. S.* 34:13*A*–2 *et seq.* Such matters of public policy in the highly volatile field of labor relations are generally best dealt with by the legislative rather than the judicial branch of government. *Cf. Building Service Employees International Union, Local 262 v. Gazzam, 339 U. S. 532, 537, 70 S. Ct. 784, 94 L. Ed. 1045, 1050* (1950); *International Brotherhood of Teamsters, etc., v. Hanke, supra.* In the instant case we need not set forth any further judicial expression on the matter, for without such expression the narrow legal issue before us may still be disposed of readily.

The defendants cite the recent decision by the Missouri Supreme Court in *Kerkemeyer v. Midkiff, supra,* and our own decision in *Simon v. Journeymen Barbers, &c., Union, Local No. 315, supra.* In the *Kerkemeyer* case the plaintiffs,

who were barbershop proprietors, sought a judicial declaration of their right to display union shop cards. While the court's decision was in the plaintiffs' favor it is important to note that, in direct contrast to the factual situation before us, its action was based on the finding that the union "now has a contract on behalf of its members with each plaintiff concerning conditions of employment." [—— *S. W. 2d* ——.] The *Simon* case involved an injunction against picketing; this court, in its opinion by Justice Wachenfeld, restated the now well-settled doctrine that peaceful picketing for a lawful objective will not be enjoined whereas picketing for an unlawful objective will be enjoined. See *Galler v. Slurzberg,* 27 *N. J. Super.* 139, 156 (*App. Div.* 1953), *certiorari* denied, 13 *N. J.* 391 (1953). However, the present case does not involve any concerted coercive action through picketing or the threat thereof; nor does it involve any strike or boycott or the threat thereof. It involves no more than a demand by the union that the defendants, who no longer operate shops recognized by the union, return (in compliance with their clear undertakings at the time they received their cards) the union's shop cards which symbolize recognition by the plaintiff union. In *Foutts v. Journeymen Barbers, etc., supra,* the Ohio Supreme Court recently pointed out that cases involving picketing, boycotts or strikes have nothing to do with a proceeding which simply involves a union's claim for the return of its union shop card from a barbershop proprietor who no longer has a union contract or union recognition. The court expressly sustained the union's right to its shop card without regard to the legality of its demand that employers, who work with the tools of their trade, become members of the union; in the course of his opinion Judge Taft said [155 *Ohio St.* 573, 99 *N. E. 2d* 785] :

"Where picketing, a strike or a boycott against an employer by a union is involved, it may be appropriate to determine whether the object sought to be achieved by such union activity is legal and proper. *Crosby v. Rath,* 136 *Ohio St.* 352, 25 *N. E. 2d* 934, *certiorari* denied 312 *U. S.* 690, 61 *S. Ct.* 618, 85 *L. Ed.* 1126; *Re-*

*statement of the Law of Torts*, Section 775. However, where a union merely discontinues its recommendation or approval of an employer and is under no contractual obligation to continue such recommendation or approval, it may discontinue such recommendation or approval for any reason. See Section 6226, General Code; *Saulsberry v. Coopers' International Union*, 147 *Ky*. 170, 143 *S. W.* 1018, 39 *L. R. A., N. S.*, 1203; annotation, 39 *L. R. A., N. S.*, 1190; *Tracy v. Banker*, 170 *Mass.* 266, 49 *N. E.* 308, 39 *L. R. A.* 508; 31 *American Jurisprudence*, 869, *Section* 84; *Giboney v. Empire Storage & Ice Co.*, 336 *U. S.* 490, 499, 69 *S. Ct.* 684, 93 *L. Ed.* 834, 842; *International Brotherhood of Teamsters v. Hanke*, 339 *U. S.* 470, 474, 70 *S. Ct.* 773, 94 *L. Ed.* 995, 1001. *Cf. Letts v. Kessler*, 54 *Ohio St.* 73, 42 *N. E.* 765, 40 *L. R. A.* 177.

The display of the union shop card in the instant case is a representation by the plaintiff to his employees and to the public that the plaintiff is recommended by and has the approval of the defendant union. If the plaintiff is not so recommended and does not have that approval, then that representation is false. Such a false representation will necessarily tend to deceive the public and the employees of the plaintiff. In the instant case, if a court of equity enjoins the defendant union from removing its shop card when the defendant union no longer either recommends or approves the plaintiff, then that court will thereby enable the plaintiff to deceive the public."

In *Head v. Local Union No. 83, Journeymen Barbers, supra,* an action by a union seeking to prevent a barbershop proprietor from retaining and displaying its union shop card, the Alabama Supreme Court embraced unequivocally the views which were voiced in the *Foutts* case. And in *Wisconsin Employment Relations Bd. v. Journeymen Barbers, etc., supra,* the Wisconsin Supreme Court not only approved the principles set forth in the *Foutts* case but took the further position that a union which no longer has any contractual relations with a barbershop proprietor has the constitutional right to withdraw the union recognition which is evidenced by its shop card. In the course of his opinion for the court Justice Currie said [272 *Wis.* 84, 74 *N. W. 2d* 818]:

"We think the first approach to the problem is to analyze the nature of the union shop card. It would appear obvious that it stands in the same category as a union label attached to, or imprinted upon, goods made by union labor. Both are in the nature of a recommendation by the union, which owns the card or label, of the services or goods to which such card or label appertains.

The recommendation by the barbers union of a particular barbershop to those of the general public who may be interested in patronizing such shop, by furnishing the proprietor with a union shop card to be displayed on the wall of his shop, is an exercise of the right of free speech guaranteed by the First amendment of the United States constitution as incorporated by the Fourteenth amendment. In the absence of any untruthful statement publicized by such card, we doubt if any legislature or court would have the constitutional right to interfere with the exercise of such right. On principle we cannot distinguish the act of withdrawing such recommendation, by removing the card pursuant to a contract entered into between the shop proprietor and the union, from the right to make use of the card in the first place for the purpose of recommending the shop to the public. The right to cease to speak would seem to be as much a right of free speech as the right to speak."

Although the briefs before us do not mention it, the suggestion has been made that the clean hands doctrine may be invoked to deny the plaintiff's claim in the district court. That doctrine is largely equitable and, when applicable, is applied flexibly upon considerations " 'that make for the advancement of right and justice.' " *Johnson v. Yellow Cab Transit Co.,* 321 *U. S.* 383, 387, 64 *S. Ct.* 622, 625, 88 *L. Ed.* 814, 819 (1944). *Cf. White v. White,* 16 *N. J.* 458, 464 (1954) ; *Medical Fabrics Co. v. D. C. McLintock Co.,* 12 *N. J. Super.* 177, 180 (*App. Div.* 1951). It would seem to have no just or proper place here. In *Associated Master Barbers v. Journeymen Barbers,* 132 *Colo.* 52, 285 *P. 2d* 599, 601 (1955), the court sharply voiced the opinion that the employer barber "would not want to perpetrate a fraud upon the public by displaying a union shop card when in fact he, or his employees, had not complied with the terms and conditions of the right to such a display." The same thing may well be said as to each of the defendants in the instant matter. When all is said and done, the naked fact remains that, justifiably or not, the defendants do not now operate shops recognized by the plaintiff union and they should not seek or be permitted to retain and display shop cards which falsely and deceptively state otherwise—that much should receive ready acknowledgment in courts of justice which rest on the very foundation of truth. The only thing which the plaintiff requests in its replevin action

is the return of its shop cards; we agree with Judge Clapp's opinion below that it is legally entitled to such limited relief and that judgment to that effect may properly be entered in the district court; nothing more need now be adjudicated.

Affirmed.

HEHER, J. (dissenting). The county district court did not have jurisdiction of the subject matter. The shop cards have but a nominal intrinsic worth; admittedly, it is the relation symbolized by the cards that is the subject of this litigation, and this is not within the cognizance of the local district court.

The union is seeking to withdraw recognition of defendants' barber shops as "union" establishments, and thus to compel the union employees of the shopowners to terminate their employment or surrender their union membership and status, unless the shopowners will accept union membership conditioned upon their surrender of fundamental civil rights, conditions that my colleagues concede "would appear to be wholly unenforceable as against an employer member who, in the rightful advancement of his own proper interests as an employer, joins an association of employers, brings a proceeding against the union, advocates legislation opposed by the union, or takes other action of similar design," but excuses because "there is no suggestion that the union is seeking to enforce any of these provisions against any employer members"; and "on the contrary counsel for the union indicated at oral argument that the defendants might properly retain their membership in the Associated Master Barbers of New Jersey (cf. R. S. 34:12–5) and otherwise protect their interests as employers but urged that the provisions were separable and were in nowise controlling on the single issue presented as to the union's legal right to reclaim its shop cards in its District Court replevin action."

But this reasoning does not, I submit, take into account the essence of the subject matter of the controversy, the relation itself and the legal rights of the shopowners; in

this, form is given ascendency over the substance. The shop-owners cannot be thus coerced into an abdication of their basic civil rights on the assurance of counsel or union officers in the midst of litigation that the surrender will not be enforced; and it is equally unavailing to suggest that, at all events, there would be legal remedies to bar enforcement.

These conditions would destroy the free agency of the shop-owners in the negotiation of collective bargaining agreements, the very freedom indispensable to collective bargaining; indeed, they prohibit any "civil action of any name or nature" against International or any local union, "either directly or indirectly," and make annulment of membership the penalty for action against the "interests" of International or any local union; members of the union are forbidden to join "any dual organization which is composed wholly or partly of employers"; and any member "found guilty of individually or collectively preventing the passage or enforcement of legislation endorsed" by the International is subject to a fine.

The union would exact submission to these unlawful demands and thereby lay upon the shopowners the costly burden of litigation should enforcement of the conditions be undertaken and, as well, the ensuing loss of business, not to mention the uncertainty and emotional impact of these continuous threatened restraints upon their freedom of action. The time to determine these issues is now.

The measure is plainly coercive, at odds with sound public policy, particularly that declared in *N. J. S.* 2*A*:15–51 and *R. S.* 34:12–5. "The union desires possession of the cards, not because it wishes to make some use of them or to sell them, but because of what they symbolize and because of the effect it anticipates from the withdrawal of them. * * * The union desires the cards because it wishes to compel the defendant to join the union and to contribute to its support." *Di Leo v. Daneault*, 329 *Mass.* 590, 109 *N. E.* 2d 824 (*Sup. Jud. Ct.* 1953).

As there also said, the "question of the right of the union to the aid of a court of equity to obtain possession of the

cards cannot be divorced from the context of the case and cannot be considered apart from the circumstances which have given rise to the controversy"; the union "desires the cards because it wishes to compel the defendant to join the union and contribute to its support"; it "brings this suit as a step in the process of compulsion"; "If the object sought is contrary to the public policy of the Commonwealth a court of equity will not lend its aid in accomplishing that object, whatever agreement the defendant may have made." And this is the principle that governs here.

The district court's jurisdiction extended only to the cards as mere chattels; the issue here concerns the relations of the parties involving equitable principles. There is no genuine controversy here as to the daily wage and shop closing hour. There was ready acceptance of the wage rate; the delay as to the closing hour had relation to the requirements of a local ordinance, and is not in dispute. It is clear that the issue now concerns the right to withdraw the cards as a means of coercing acceptance of union membership conditioned upon the relinquishment of freedom of action violative of public policy and natural right; and on the plainest principles of equity and justice there can be no affirmative relief when the demand for the cards is so conditioned. The shop employees are all members of the union in good standing. By express provision of the union's constitution, "When the Union Shop Card is removed from any shop for violation of the laws, rules, regulations and agreements, all members employed therein shall immediately leave the employment of said shop."

And, notwithstanding the concession below, it is by no means clear that the collective bargaining agreement terminated by its own limitation on July 31, 1954. There was a provision for annual automatic renewal "upon the anniversary date, without further notice," provided that "either party may open this agreement for the purpose of discussion and revision upon written notice" by either party to the other "not less than thirty days prior to the expiration of this agreement."

I find no evidence of record that notice was given by either party to the other, prior to the expiration of the current term, of an "opening" of the agreement for "discussion or revision," much less to consider a proposal for the submission of the shopowners to union membership upon the stated conditions.

I shall not elaborate on this issue. It suffices now to say that it is one calling for full inquiry; and that the failure to raise the question below is not conclusive. It involves public policy in labor relations, a major public concern that cannot be set at naught by the default of individual parties to the litigation.

I would reverse the judgment of the district court, and remand the cause for transfer to the Superior Court for hearing and disposition there in accordance with equitable principles.

*For affirmance*—Justices OLIPHANT, WACHENFELD, BURLING and JACOBS—4.

*For reversal*—Justice HEHER—1.