80 N.J. Super. 203 (1963)
193 A.2d 285
JAMES LAMENA, PLAINTIFF-RESPONDENT,
v.
CAMDEN LOCAL NO. 396 OF THE JOURNEYMEN BARBERS, HAIRDRESSERS, COSMETOLOGISTS AND PROPRIETORS' INTERNATIONAL UNION OF AMERICA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 1963.
Decided July 8, 1963.
*204 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Albert K. Plone argued the cause for appellant (Messrs. Plone, Tomar, Parks & Seliger, attorneys; Mr. Howard S. Simonoff, on the brief).
Mr. Lee B. Laskin argued the cause for respondent.
*205 The opinion of the court was delivered by CONFORD, S.J.A.D.
The Chancery Division enjoined the defendant union from picketing plaintiff's barbershop in Haddonfield for purposes of causing or coercing him to join the union or coercing his nonunion employees into doing so. The union (hereinafter referred to as the barbers' local) appeals.
The facts shown by the record are these. Plaintiff operates a small barbershop in which he regularly employs one apprentice barber and occasionally a part-time journeyman barber. Plaintiff himself works as a barber alongside his employees. Neither of these employees belongs to the barbers' local, nor has it ever requested them to do so. The apprentice testified he had voluntarily looked into the matter of joining the union but decided not to. Plaintiff formerly belonged to a barbers' union but left it because the union rules call for closing on Wednesday whereas plaintiff prefers to close on Monday. Plaintiff's hours of operation are 8 A.M. to 7 P.M., the same as the barbers' local's; his only apparent conflict with the union's regulations is as to closing Monday instead of Wednesday. The union has not complained about the rate of compensation he pays his employees.
For some time prior to May 1962 the secretary and the president of the barbers' local importuned plaintiff to close on Wednesday instead of Monday. They expressed the fear that other shops might start closing Monday, thus weakening the union's Wednesday closing policy. Plaintiff remained adamant. The requests then turned to proposals he join the union, and he refused these likewise. It was implicit that if he joined the union his employees would also have to do so because the union constitution requires that only union members may be employed in a union shop or one which displays the union shop-card.
On May 9, 1962 the barbers' local representatives came to the shop and told plaintiff this was the "last time," and that he was "going to go along with [them]." He again refused, and they directed two waiting men to don signs and start *206 picketing. The picketing continued every day for over a week until restrained by the court. The signs read: "This Barber Shop Does Not Display The Union Shop Card Of Barbers Local 396" and "The Barbers In This Shop Are Not Members of Local 396." The picketing was accompanied by a drop in plaintiff's business. An attempt at the hearing to prove that a service vehicle would not make a delivery to the shop because of the picketing was barred, on objection, as hearsay. However, it is conceded by plaintiff that the picketing was peaceful at all times.
The picketing was enjoined by the Chancery Division May 17, 1962 pursuant to an ex parte order to show cause and restraint made returnable May 25, 1962, based upon affidavits, not set forth in the appendices to the briefs, but purportedly averring that immediate, substantial and irreparable injury would probably result to plaintiff before a hearing on notice could be had. The restraint order expired by its terms May 25, 1962. A full hearing was conducted May 31 and June 1, 1962 when the court announced oral conclusions, which, though finding no "substantial" loss of business, determined that there was no "labor dispute" and that therefore the "object of the picketing [was] not lawful" and the restraint would be continued. Accordingly, on June 11, 1962 the court entered an injunctive order restraining the picketing. The order finds there is no labor dispute as defined in N.J.S. 2A:15-58, N.J.S.A., (Anti-Injunction Act) and that "injunctive relief may be based upon general Chancery Court principles"; that the picketing was "for the purpose of requiring plaintiff to join Defendant Union," which was an "unlawful object and therefore enjoinable." Thereafter the parties stipulated that the hearing already held be deemed the final hearing in the matter, and final judgment of injunction was entered August 1, 1962, substantially in the content of the order of June 11, 1962.
Defendant appeals on two broad grounds: (1) the controversy involves a labor dispute within the meaning of the Anti-Injunction Act, and it was unlawful to enter interim *207 restraints without compliance with the several procedural requisites imposed by that statute; (2) the object of the picketing was lawful, and the injunction therefore violated "free speech" rights guaranteed by the First and Fourteenth Amendments of the United States Constitution, as well as the right of collective bargaining declared in Article I, paragraph 19 of the 1947 Constitution of New Jersey.
We have concluded that the litigation projects important questions of law and public policy for the fully satisfactory determination of which the proofs before us are inadequate, and that more exhaustive development of the legal issues than was had either at trial level or before us is desirable, particularly in the light of the further proofs to be adduced. For these reasons a remand will be necessary. The charting of the factual and legal issues to be developed requires some additional reference to the facts now known.

I.
The "constitution" of the International Union, of which the barbers' local here involved is a member, was introduced in evidence, and defendant's representative testified the barbers' local operates pursuant thereto. Under the constitution, both "proprietor barbers" (non-employers) and "employer" barbers who work with the tools of the trade are eligible to membership in a local union, and "all members are entitled to equal rights of membership, including the right to vote and hold office." (Plaintiff is an employer-barber.) Provision is made for "employers' guilds," apparently inside the local union entity, consisting of 15 or more employer-barbers. We find nothing in the constitution, however, specifying the economic rights, powers, duties or obligations of such guilds or their members, particularly with respect to collective bargaining vis a vis the employee members of the union. There is nothing before us to indicate that an employers' guild exists in the territorial jurisdiction of the barbers' local.
*208 The heart of the substantive problem before us, from plaintiff's standpoint, lies in article XV, section 5 of the constitution. It reads:
"SEC. 5. Every local union shall regulate the hours of labor, prices and wages in their respective locality, which shall be known as the `Working Agreement.' Any working agreement or amendment thereto must be read at two meetings on separate dates, prior to third meeting at which vote is taken; all members shall be notified in advance of date of meeting at which vote is to be taken. A two-thirds vote of members present shall be necessary for working agreement to be adopted. Two copies of the agreement, before it is printed, shall be submitted to the General President-Secretary-Treasurer, for his approval, after which one copy will be returned to the local.
A Working Agreement stabilizes conditions for a stated period of time and no agreement can be amended during the stated period except by unanimous consent of all parties to the said agreement. No working agreement or amendment thereto shall become effective unless the foregoing is complied with.
The Working Agreement shall be submitted in duplicate to the shop owner for his signature, one copy for the local file and one copy for the person signing same."
There is no provision in the constitution for collective bargaining as to wages or working conditions between employer members of the union, individually or as a class, and employee members, either in individual shops or as an entire class. Article XV, section 5 would seem to preclude it. However, the barbers' local secretary-treasurer testified, in answer to a question, "How about negotiating the terms of your working contract, who does that?," that the employers are "represented by their committee" which discusses "the matters of the wages and the hours" with an employees' committee "until they come to an agreement." There was no development of the question as to what happens if no mutual agreement is arrived at between the committees. There was testimony that the union has 248 members of which "90, 95 percent are employees, the rest are shop owners, employers." However, at oral argument defendant corrected these figures to state that of a total of 245 members of the barbers' local, 110 are operators of "one-chair" shops, having no employees, 60 are employers of one or more barbers, and 75 are employees.
*209 Moreover, the constitution (as revised effective January 1, 1959) continues to include certain provisions summarized in Journeymen Barbers, etc., Local 687 v. Pollino, 22 N.J. 389, 395, 396 (1956), as follows:
"The defendants contend that the objective of the plaintiff to have them become members of the union `is unlawful because they would become bound by provisions of the International Union Constitution which would incapacitate them from acting as free agents in the negotiation of collective bargaining agreements.' In particular they complain about article II, section 4 of the International's constitution which prohibits any member of the International from bringing any civil action against the union; article XVII, section 7 which provides that any member who shall operate against the interests of the union shall have his membership annulled; article XVII, section 8 which forbids any active member of the International from joining any dual organization which is composed wholly or partly of employers; and article XVIII, section 1 which provides that any member found guilty of preventing the passage of legislation endorsed by the International shall be fined."
The Supreme Court there commented upon such provisions (at p. 396):
"These provisions would appear to be wholly unenforceable as against an employer member who, in the rightful advancement of his own proper interests as an employer, joins an association of employers, brings a proceeding against the union, advocates legislation opposed by the union, or takes other action of similar design."
However, in the context of the narrow issue there involved, the union's right to replevy a union shop-card after expiration of a so-called collective bargaining agreement, and notwithstanding the union's alleged motive to break up an operators' association and compel the operators to join the union, the court majority noted (p. 396) that counsel for the union had represented that such provisions would not be enforced against plaintiffs (shop operator-employers) if they became union members and contended the offensive provisions were separable "on the single issue presented as to the union's legal right to reclaim its shop cards" in the replevin action. Ibid.
In the case now before us, there is no evidence and there are no assurances by or on behalf of this barbers' local that these *210 invidious provisions of the constitution would not be enforced against plaintiff if he joined the union. Perhaps this is because plaintiff did not raise that particular issue. However, we are here confronted with an issue of public policy in which the public at large has sufficient interest to warrant the court's taking notice of the matter, particularly since defendant places heavy reliance upon other portions of the court's opinion in Pollino. Cf. Texas Co. v. DiGaetano, 71 N.J. Super. 413, 423, 429 (App. Div. 1962), affirmed 39 N.J. 120 (1963).
As to the principal substantive issues involved in this litigation, plaintiff emphasizes the anomalous position in which he would be placed, in his dual status as employer of labor and union member, in respect of collective bargaining as an employer. He says: "Labor and management are merged. At one end of the bargaining table sits the union, the other chair is vacant. Somewhere in the middle is the unfortunate employer caught on the horns of a dilemma." Prima facie, on the record before us, the employer-barbers in such a union enjoy no real right to bargain with their employees. They can state their position as employers on wages and working conditions to their employee colleagues in the union, but if the latter differ, the resolution of the issue is weighted for the employees by virtue of the fact that they outnumber the employers 75 to 60 in the determinative union councils, where the official "working agreement" is decided by a 2/3 vote of the membership at large. The individual employer must apparently accept the organization edict or be labelled a violator of the union's constitution. This analysis of the impaired bargaining position of the employer members of the barbers' local is not answerable on the possibility that the 110 "one-chair" barbers may vote for the employers' position rather than that of the employees, as to wages, for example. That class of union member is presumably disinterested in the subject of wages as it has no employees. Indeed, it is anomalous that those members should have the right to vote on that issue at all.
*211 It thus appears that employer members of the union do not have the status enjoyed by an employer in normal collective bargaining relationships, i.e., that of arm's length bargaining, as an independent party to the negotiations, in advance of the contingency of impasse or breakdown in the confrontation of the two coequal bargainers. The normal collective bargaining process between completely independent coordinate parties or their representatives is, by the history of labor-management relations over the past 30 years or more, the method best designed to achieve industrial harmony because democratic in nature and best calculated to lead to fair resolution of differences with adequate recognition of the legitimate interests and requirements of both sides of the bargaining dichotomy. This now universally accepted fundamental is the cornerstone of our labor law and practice, both state and federal. Supporting authority is so abundant and self-evident as not to require citation.
The burden of proof rests on the shoulders of those who, like defendant, would assert that the hybrid-captive status contemplated for employers by what is apparently this union's modus operandi is not offensive to our public policy.
It would seem that, in principle, collective bargaining is no less impaired if the employer-members outnumber the employee-members. As indicated by the Missouri Supreme Court in the decision next referred to herein, it would be the employees in such case who would be deprived of independent bargaining status.
The only case cited to us by either side wherein this particular facet of the functioning of the barbers' union is discussed and analyzed is Kerkemeyer v. Midkiff, 299 S.W.2d 409 (Mo. Sup. Ct. 1956). The issue there arose in connection with a suit by barber shop owners to obtain a declaration of their right to display union shop-cards where employees were all members of the union (same International as in the instant case) and all other union regulations were being observed but the owners refused to join, though working as barbers in their shops. In deciding for plaintiffs, the court *212 noted that plaintiffs had existing collective bargaining agreements with the union on behalf of plaintiffs' employees. It approved this process of collective bargaining, but said, "The benefits of this necessarily extend to the employer as well as the union, and it is axiomatic that this right of collective bargaining becomes a farce if the freedom of either party to promote and advance his own interest is subject to the consent and approval of his adversary." (at p. 414; emphasis added)
The court stressed that as union members plaintiffs would be "completely subservient to every demand of the union" (p. 414); that it changed the issue not at all to say that in theory the employer members could outnumber employee members because then "the tables are * * * reversed and it is the employer who is sitting on both sides of the bargaining table." (at p. 415)
The court concluded as follows:
"We cannot escape the conclusion, and we hold, that it is contrary to the public policy of this state, and therefore an unlawful labor objective, for a labor union to exert economic pressure on an employer to compel him to join a union of his employees when to do so makes him subject to union `laws' which destroy or substantially impair his right to assert and protect those interests essential to his status as an employer in negotiations with the union concerning the terms and conditions of employment of his employees. In the Riviello case [Riviello v. Journeymen Barbers, etc., 88 Cal. App.2d 499, 199 P.2d 400 (D. Ct. App. 1948)] the demand of the union was unlawful because compliance therewith would result in the employer becoming a `sterile' member of the union. Here the demand is unlawful because compliance therewith will result in the rights of the plaintiffs as employers becoming `sterile' * * *." (at p. 417, Emphasis added)
Our own Supreme Court decision in the Pollino case, supra, is typical of a number of others cited therein in other jurisdictions not involving picketing, but only the right to possession of the union shop-cards, wherein the courts rested their decisions in favor of the union on the property right of the union in its shop-cards. See the Pollino decision, at pp. 401, 402. These cases did not decide the underlying question of *213 the lawfulness of the union's objectives, especially in relation to the impairment of the employer's rights in the collective bargaining process.
There are some cases which approve, expressly or inferentially, see Pollino, supra, at pp. 396, 397, 398, the concept that the union has an appropriate interest in bringing within the union such proprietor barbers as work with the tools of the trade because of the competitive effect of the practices of such proprietor barbers on the maintenance of union standards of hours and working conditions favorable to the interests of employee barbers. See, e.g., Messner v. Journeymen Barbers, etc., 53 Cal.2d 873, 4 Cal. Rptr. 179, 351 P.2d 347, 355 (Sup. Ct. 1960); McBride, J., dissenting in Grimaldi v. Local No. 9, Journeymen Barbers, etc., 397 Pa. 1, 153 A.2d 214, 223 (Sup. Ct. 1959). But none of these cases, so far as we can ascertain, considers and weighs the counter-effect of the impairment of the employer member's position in collective bargaining. Decisions involving proprietor barbers who are not employers would not appear relevant in this regard. See the conflicting decisions in Coons v. Journeymen Barbers, etc., 222 Minn. 100, 23 N.W.2d 345 (Sup. Ct. 1946), and Grimaldi v. Local No. 9, Journeymen Barbers, etc., supra. See, generally, Comment, "The Right of Unions to Require Employer Membership," 24 U. Chicago L. Rev. 733 (1957); Note: "Self Employer In the Law of Picketing," 41 Minn. L. Rev. 655 (1957); Annotation, 13 A.L.R.2d 642 (1950). Nor do we presently cite or discuss decisions involving allegations that the price-fixing operations of this International Union involve illegal restraints of trade, that issue not having been adverted to below or here at all. But see Note: "Price-Fixing Within the Barber Industry," 34 Ind. L.J. 621 (1959).
The defendant's position on this appeal on the substantive question of policy is that a working barber, whether an employer of others or not, is in a position by the hours and conditions of employment he personally observes in his own work, to affect the hours and conditions of the union-won scale, and *214 that therefore it is a legitimate union objective to try to bring him within the fold so as to enforce industry-wide uniformity in these matters. The decision adverse to the union in Simon v. Journeymen Barbers &c., Union, Local No. 315, 11 N.J. 448 (1953) (a shop-card dispute), rested solely on the discriminatory nature of employer status in the union then obtaining (no right to vote or hold office) and since eliminated by amendment to the constitution. To the extent of the proposition of proper union interest in achieving working employer membership, as just stated, we are in accord. Our Supreme Court expressed a persuasively sympathetic reaction to that philosophy in the Pollino case, ubi cit., supra. It also finds exemplification in other industries where independent contractors labor in the same way as union member employees. See Local 24 of I.B. of T., C., W. & N. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed. 312 (1959). That point of view is peculiarly cogent in relation to the union objective of organizing proprietor barbers who are not employers. There, the unalloyed appropriateness of bringing the barber into the fold in relation to working conditions (notwithstanding such barbers are not interested in the subject of wages) is not countered by the impaired capacity to bargain collectively as an employer. To the extent that defendant argues here from the basis of the justification for unionization of that class of proprietor barber, this court has no problem. What concerns us is where the net balance of over-all public interest and policy lies where a comprehensive union organizational structure, while in one respect serving a proper labor objective, at the same time derogates a fundamental right of employers in another.
We are particularly interested in whether it is not feasible for the union organizational structure to be so arranged that, while working proprietor barbers will be subject, as working members of the union, to observance of the hours and working conditions fixed under a negotiated collective bargaining agreement, yet, at the same time, employer barbers will have *215 the normal right of independent collective bargaining status in negotiating the labor agreement.
It is agreed that this case does not involve federal statutory labor law, only state law and policy. The parties are also in agreement that the federal constitutional rights of free communication in relation to peaceful picketing are not offended if the purpose of the picketing is to accomplish a result contravening a significant and justifiable state policy, statutory, constitutional or judicially declared. Ind. Dairy Workers, etc. v. Milk Drivers, etc., Local No. 680, 30 N.J. 173 (1959).
In the Pollino case, supra, as indicated above, the court found no occasion for determining what New Jersey policy was in relation to union organization activities aimed at encompassing employer barbers, considering the specific issue before it as not requiring a conclusion thereon. (Mr. Justice Heher, dissenting, held the union rules destroyed "free agency of the shopowners in the negotiation of collective bargaining agreements," but without expressed reference to article XV, section 5, quoted from above. 22 N.J., at p. 402 et seq.) Sympathetic to the mentioned objective as related to an appropriate union interest in maintaining salutary working conditions for barbers, the court specifically noted that there was no general public policy against working employer-barbers' becoming members of the union and supporting it "at least to the extent that their interests coincide" (22 N.J., at p. 396; emphasis added). The court in Pollino also noted, in contrast with the instant situation, that "the present case does not involve any concerted coercive action through picketing or the threat thereof." It observed that public policy in the area involved was more appropriately delineated by the Legislature than by the courts, and that the lawmaking body had not yet expressed itself (at p. 398). However, as also pointed out by the Supreme Court in Ind. Dairy Workers, etc. v. Milk Drivers, etc., Local No. 680, supra (30 N.J., at pp. 181, 182), although state legislation in the intrastate labor field is always appropriate, yet, where the legislature has not acted, and important private rights hang in the balance, the judiciary *216 cannot remain "inert" and permit controversies over them to be settled through trial by economic battle when those injured apply for judicial relief. The present controversy must therefore be determined in this litigation.
The crux of the case, then, as we see it, is whether a weighing of the conflicting interests, rights and justifiable concerns of all parties to or involved in this controversy, especially those we have discussed above, warrants the conclusion that the union's objective in picketing plaintiff is offensive to New Jersey public policy, thus justifying injunctive relief to the plaintiff as directly injured thereby. The policy issue herein is portentous and now for the first time squarely posed to a New Jersey court for decision. In our judgment, more proofs are needed for its satisfactory resolution.
We desire information as to how the so-called committee system of bargaining between employers' representatives and employees' representatives within the union, as described by defendant's officer, has operated in practice. What is the present wage scale set in the "working agreement"? How was it arrived at? To what extent did it or previous scales result in fact from negotiations between such de facto committees as distinguished from determinations by the membership at large by two-thirds vote as specified by the constitution? Similar information should be provided as to provisions for working hours, closing days and any other significant subjects covered by the "working agreement." Is there an employers' guild in this local? What actual powers and functions does it have, either in theory or practice?
With respect to the several constitutional regulations curtailing employer members' rights of membership in other organizations, and in the other respects mentioned above as having been condemned by the Supreme Court in Pollino, supra, will the union now adopt a resolution exempting employer-members from them if they join the union, and prove its adoption thereof at the hearing on remand? What is the position of the parties as to whether such provisions are separable *217 from the union constitution as a whole in the context of this litigation? Compare Pollino, supra (22 N.J., at p. 396).
We would welcome proofs, expert or otherwise, to furnish light on the query posed hereinabove as to whether it is not feasible for the union to be so organized as to serve both the objective of achieving compliance by proprietor barbers who work with the tools of the trade with union-won hours and working conditions and that of retaining an independent bargaining status for employer barbers in the collective bargaining process.
Either side will be at liberty on the remand to offer any other proofs concerning the factors we have indicated in the course of this opinion as relevant in determining whether the object of the picketing here was contrary to New Jersey public policy.
The trial court will expedite the hearing on the remand herein ordered and make and file findings of fact. The transcript of hearing and findings of fact will be returned to this court with reasonable promptness and the parties will then apply to the court for an order as to the filing of supplemental briefs and setting the appeal down for further argument.

II.
We have reserved for final mention the issue as to the applicability of the procedural provisions of the Anti-Injunction Act. See N.J.S. 2A:15-51 to 58, N.J.S.A. An injunction or restraint must be preceded by these prerequisites "in any case involving or growing out of a labor dispute," as defined by the act. N.J.S. 2A:15-53, N.J.S.A. Some of the requirements were not here met, the trial court not regarding the case as one in which a "labor dispute exists." We will not here analyze the statute or pertinent decisions as we have concluded that resolution of the debatable and controversial questions particularly presented in that regard by this case will also be better served by the fuller factual picture we *218 expect to have before us on the return of the record after its expansion on the remand. See, however, Outdoor Sports Corp. v. A.F. of L., Local 23132, 6 N.J. 217 (1951); Ind. Dairy Workers, etc. v. Milk Drivers, etc., Local No. 680, supra (30 N.J., at p. 185); U.S. Pipe, etc., Co. v. United Steel Workers of America, 59 N.J. Super. 240 (App. Div. 1960); Commercial Can Corp. v. Local 810, Teamsters, 61 N.J. Super. 369 (App. Div. 1960).
As a matter of discretion, in the light of the prima facie state of the pertinent proofs and the law, we direct that the injunction remain in effect unless and until the Chancery Division or this court otherwise orders on the submission of the further showing. Costs and the matter of counsel fees are reserved until final determination of the appeal.
Remanded to the Chancery Division for further proceedings consistent with this opinion.